[No. A024798. First Dist., Div. One. Dec. 21, 1984.]

FRANK L. JARDINE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
J & K EQUIPMENT CO. et al., Respondents.

COUNSEL

Michael G. Gerson and Boxer, Elkind & Gerson for Petitioner.

Arnold H. Mentz, Mentz, Finn & Clarke and Bryce C. Anderson for Respondents.

OPINION

**NEWSOM, J.**—The instant petition for a writ of review to annul the Workers' Compensation Appeals Board's (hereafter Board or WCAB) opinion and decision arises in the following factual context, which we summarize as necessary to our opinion.

On February 7, 1979, Jardine, a man of 58, sustained serious injuries[1] in the course of his employment with J & K Equipment Co., when a loader rolled over him and crushed his body. His injuries included extensive damage to the chest, abdomen and pelvis, and brain surgery was required in order to relieve pressure for a bilateral frontal subdural hematoma. In the course of his physical recuperation, he developed psychological and emotional problems.

---

[1]Since the residual seriousness of such injuries is disputed, it may be useful to list in some detail the original diagnosis: Jardine's injuries included brain injury with bilateral subdural hematoma; abdominal injury with laceration of the diaphragm and a mesenteric artery; a severe pelvic fracture; a fracture of the left hip; a fracture of the left tibia and fibula; fractures of the rib; denervation of the bladder; memory dysfunction; and severe mental depression.

On September 12, 1979, he filed an "Application for Adjudication of Claim" against J & K Equipment. J & K's insurance carrier, Fremont Indemnity Company (Fremont), meanwhile provided Jardine with temporary total disability benefits at the rate of $154 weekly.

But on June 1, 1981, based upon medical reports that Jardine's condition had stabilized, Fremont reduced its payment to $70 per week. A dispute arose between the parties: was Jardine merely "permanently partially disabled"—and entitled to $70 per week—or "permanently *totally* disabled"— and entitled to $154 per week?

On December 8, 1981, a pretrial conference was held concerning this issue and the parties agreed upon the appointment of two "agreed medical examiners" to decide the issue: Dr. Joseph Bernstein would evaluate Jardine's orthopedic disability, while Dr. Bradford Murphey would evaluate his claimed psychiatric disability.

On April 13, 1982, Dr. Bernstein released his evaluation, which concluded that Jardine was permanently totally disabled. On June 14th, Dr. Murphey's report echoed this finding. Nonetheless, Fremont continued paying benefits of $70 weekly.

Thereafter, petitioner repeatedly demanded of Fremont Indemnity that it pay him full benefits; receiving no response, on November 10, 1982, he filed a "Declaration of Readiness to Proceed before the Board."

On December 2, 1982, Fremont reconsidered and began paying Jardine full permanent disability benefits, and reimbursing him retroactively for the difference in payments.

In July of 1983, the Workers' Compensation Appeals Board judge issued his findings and award, concluding that petitioner had indeed sustained a full permanent disability and imposing a 10 percent penalty against Fremont, as provided by Labor Code section 5814, for the latter's unreasonable delay in making payments.

Fremont thereupon filed a petition for reconsideration asserting error on the part of the judge in imposing the penalty, while petitioner filed a petition for reconsideration seeking multiple penalties under section 5814.

Thereafter, the Board issued its opinion and order denying petitioner's claim and granting Fremont's, upon the ground that the latter had acted reasonably in delaying Jardine's benefits.

■■■■ The first issue before us, then, is whether substantial evidence supports the Board's finding that Fremont's long delay in paying Jardine total disability benefits was justified. Put slightly differently, was it *reasonable* to believe that between June 14th and December 2d of 1982, Jardine was only partially disabled?

Our inquiry begins with a review of the chronology of events and consideration of all relevant medical reports.

As earlier stated, Jardine's injuries were massive: they resulted from his being crushed by a tractor. Unsurprising, then, is the conclusion of his treating physician, Dr. Silverberg, on September 14, 1979—eight months after the accident—that "unless something changes, I think he is disabled insofar as work is concerned for the rest of his life"; that, a few months later, "he still remains incapacitated for work . . . . I suspect . . . permanently"; that, another six months later, "I think it unlikely . . . [he] will ever be able to return to work as an operating engineer."

At about the same time as Dr. Silverberg's last report in August 1980, Dr. Kiernan, a psychologist, noting that Jardine had sustained multiple fractures and internal injuries as well as serious brain trauma, found residual intellectual dysfunction, depression, confusion, constant pain and continuing mental disability, sufficient to warrant a neuropsychiatric referral.

Dr. Kiernan's comments include the information that Jardine, who had formerly functioned in the average range of intelligence, now performed *none* of the Wechsler Scale tests in the average range. He found that Jardine suffers from "continuing mental disability," and "word finding difficulty," and "feels useless because of his pain." Included in the Kiernan report is Mrs. Jardine's concern over her husband's confusion and frustration, and her poignant description of having found her husband digging small holes in the garden because, he said, "he was making a place to store rocks."

In early 1981, Jardine was examined by Fremont's doctors for the first time.

First among these was Dr. Barnes, who, while depreciating all other of Jardine's claims,[2] physical and emotional, concluded that, because of the brain injury, "It would probably be reasonable to consider him permanent and stationary with regard to the effects of the head injury at this point."

---

[2]Thus, Dr. Barnes notes Jardine's "vague complaints about his left leg." The left leg, we repeat, had been crushed by a tractor.

Dr. Denenberg's report for Fremont is no less skeptical and indeed, no less extraordinary. After noting that Jardine was unable to *walk* for more than 20 minutes, and suffered from sacro-iliac arthritis and persistent diastasis of the symphysis, and that Jardine's symptomatology "will persist without . . . surgical intervention," Dr. Denenberg concluded that Jardine should "avoid heavy bending or lifting . . . or activities which would require running or long walking."

Dr. Detrick, also retained by Fremont, found as follows: "Mr. Jardin [*sic*] is functioning significantly better than he was at his previous neuropsychological assessments (August 15, 1980). At the previous assessment he had a wide variety of behavioral deficits due to disturbed cortical functioning. The present assessment indicated that the primary area of disturbed cortical functioning is presently in the area of his memory. The present assessments showed his cognitive flexibility to be within normal limits and his capacity to do arithmetical calculations excellent. He showed no motor or sensory disturbance due to cortical dysfunction. In regard to his cognitive functioning he should be able to perform adequately insofar that [*sic*] the tasks do not rely primarily on memory. His *significant* level of depression should be seen as a major contributor to his lowered level of functioning in his every day life." (Italics added.)

At this point, and based upon the combined reports of the three physicians just mentioned, on June 1, 1981, Fremont reduced Jardine's benefits from $154 to $70 weekly. Three months later, Fremont received from Dr. Barnes a follow-up report in which, among other observations, he opined that the previous psychological assessment by Dr. Kiernan had "vastly exaggerated [Jardine's] deficits," that Jardine's pelvic pain "may be exaggerated" and, in conclusion, that the patient had a disability "precluding heavy work."

A further examination by Dr. Silverberg in February of 1982 found Jardine essentially unchanged, "unemployable and . . . not a candidate for rehabilitation."

Faced with such egregiously disparate medical opinions, at a pretrial conference on December 8, 1982, the parties agreed upon the appointment of two "agreed medical examiners," Drs. Bernstein and Murphey.

The opinion of these experts was unequivocal. Thus, on April 13, 1982, Dr. Bernstein, expressing "surprise" that Jardine was even able to *walk* for 20 minutes without crutches, concluded that the patient suffered "overwhelming disability" and was "unable to be employed"; while Dr. Murphey's examination on June 14, 1982, led him to conclude that Jardine was

"totally disabled," unrehabilitatable, and that his condition was "permanent and stationary and no improvement can be anticipated."

Of particular significance, in our opinion, is Dr. Murphey's comment that, finding Jardine to be deeply depressed, and that such a finding was at variance with the reports of Drs. Barnes and Detrick, Murphey referred Jardine to Dr. Kalis for additional neuropsychological testing. The latter's report "completely confirm[ed]" Murphey's as well as Kiernan's earlier finding of organic brain damage and consequent depression.

Confronted now with what can only be described as definitive if not dispositive medical evidence that Jardine was permanently and gravely disabled, Fremont nevertheless refused to pay Jardine the additional $84 weekly to which total permanent disability would have entitled him for fully six months after receipt of Dr. Murphey's report.[3]

■ In a case of permanent disability, as here, an employer is normally required under Labor Code section 4650 to begin paying permanent disability benefits either "on the fourth day after the injury becomes permanent or the date of last payment for temporary disability, whichever date first occurs." If the employer refuses to pay, or unreasonably delays paying, such benefits, he will be subject to the 10 percent penalty under Labor Code section 5814. The only satisfactory excuse for delay in payment of disability benefits, whether prior to or subsequent to an award, is "genuine doubt" from a medical or legal standpoint as to liability for benefits. The burden is on the employer or his carrier to present substantial evidence on which a finding of such doubt may be based. (*Kerley* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 223 [93 Cal.Rptr. 192, 481 P.2d 200].)

As our Supreme Court said in *Kerley, supra,* "The language of the statute makes it abundantly clear that an employer or carrier has no absolute right to delay the provision of benefits until a formal hearing. [The idea that an] employer or his carrier is relieved of any responsibility for advance payments until either the referee has made an award or the employee has established beyond any reasonable doubt the nature and extent of his permanent disability . . . is contrary to the express terms of section 5814 and is clearly inconsistent with the statutory admonition to liberal interpretation of the workmen's compensation laws." (*Id.,* at pp. 227, 230.)

■ We have carefully reviewed the medical evidence upon which Fremont relied in delaying payment of permanent disability to Jardine, and find it to be in its totality self serving, internally inconsistent, and unreliable.

---

[3]And 18 months following its reduction of benefits to Jardine.

Such evidence, particularly in light of the subsequent reports, in no way approximates the kind of "genuine doubt" envisioned by section 5814.

As was said by the Workers' Compensation Appeals Board judge who originally imposed the section 5814 penalty against real party in interest: "This is not a case in which there is simply a conflict in the evidence. This is a case in which the overwhelming weight of the medical evidence, both in terms of the number of examiners, and the cogency of their reports, concludes that the applicant was totally disabled. The contention of the defendants is that because there is some evidence which would indicate that the applicant was less than totally disabled, they were entitled to await the decision of the judge before adjusting the compensation rate . . . . The defendants . . . fail to demonstrate why there could have been any reasonable expectation that the applicant would receive anything other than 100 percent permanent disability for the profound handicap which he has suffered as a result of his severe multiple injuries. Temporary disability indemnity was suspended on June 1, 1981, and was not adjusted until December 8, 1982. Subsequent to the receipt of the reports of the agreed medical examiners, there could be no reasonable question as to the outcome of this case. It is therefore concluded that the defendants were unreasonable in neglecting, until December 8, 1982, the adjustment of the applicant's compensation rate."

We endorse this statement in all respects, and we think that its interpretation of section 5814 is in keeping with the intent of the law. ■ Contrary to Fremont's claims, section 5814 was designed to safeguard employees', not employer's, rights. It was intended to "encourage employers and carriers to make voluntary, timely compensation payments by making delay or refusal to pay more costly," and to place the burden of nonpayment on the employer. And it was intended "to be liberally construed in accordance with the general purpose of the workers' compensation laws." (1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) Award, Enforcement, § 6.07, pp. 6-31 to 6-34.) (*Kerley, supra,* 4 Cal.3d at p. 227.)

■ In effect, Fremont has in these proceedings asserted that, whenever an employer is able to generate "conflicting" medical evidence, it will be justified in withholding payment of the total disability rate.

But this position is not only abstractly specious and untenable—in the real circumstances of the present case its impact is unconscionably cruel, inflicting upon a grievously injured, deeply emotionally depressed employee a painful ordeal of doubt, frustration, delay and disappointment.

Having found no such evidence as would justify Fremont's claimed "genuine doubt," we annul the Board's finding as unsupported by substantial evidence and resting upon reports which in any event were "no longer germane." (*Jones* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 476, 480 [67 Cal.Rptr. 544, 439 P.2d 648], disapproved on another ground in *Le Vesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 636, 637 [83 Cal.Rptr. 208, 463 P.2d 432].)

A second contention by petitioner is that the Board erred in refusing to impose multiple penalties against Fremont Indemnity under section 5814 for its delay in payment of benefits. Citing *Gallamore* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 815 [153 Cal.Rptr. 590, 591 P.2d 1242], he maintains that Fremont's failure to respond to each of nine requests for payment constitutes "separate acts of misconduct" for which he is entitled to additional penalties. The argument is without merit.

In *Gallamore, supra,* the criterion for assessing multiple 5814 penalties is "separate act(s) of misconduct." As the court there said: "[W]e agree . . . that [normally] the additional penalties *must be preceded by the imposition of 'a first penalty' and follow a further unreasonable delay.* Such a limitation upon the assessment of multiple penalties is appropriate to assure that the employer or carrier is not doubly penalized for what may be essentially a single act of misconduct, and, further, to provide reasonable notice of the risk of imposition of multiple penalties. Where, however, the circumstances disclose *separate and distinct acts of delay or nonpayment,* and prior notice was given of the applicant's intent to seek separate or additional penalties for such acts, *then multiple penalties are appropriate in a single penalty proceeding.*" (*Gallamore, supra,* 23 Cal.3d at pp. 823-824, italics added.)

Sympathetic though we are over the wretched treatment Jardine has endured, we are unable to conclude that Fremont's ongoing reliance on the 1981 medical reports and its consequent repeated refusals to pay full benefits represent "separate and distinct acts of delay or nonpayment." As aptly said by the WCAB judge who originally decided the rate question in Jardine's favor: "If applicant's theory of multiple penalties in the context of the single continuing act of defendant were correct, the number of potential penalties in a similar case would be limited only by the capacity of applicant's counsel's word processing machine to produce repeated demands. No new facts developed subsequent to the receipt of Dr. Murphey's report which rendered the behavior of the defendants any more unreasonable than it had been when they initially declined or failed to make advances following

the receipt of that report. Certainly the duration of the delay is not an appropriate ground for assessing multiple penalties."[4]

The request for multiple penalties is denied.

The order of the WCAB is annulled, and the 10 percent penalty is restored.

Racanelli, P. J., and Holmdahl, J., concurred.

---

[4]Another case relied on by petitioner, *Viegas* v. *Workers' Comp. Appeals Bd.* (1983) 148 Cal.App.3d 423 [196 Cal.Rptr. 10], is also distinguishable. In *Viegas,* the Court held that where an insurer unreasonably delays making disability payments both prior to and following its stipulated liability for said payments, this constitutes "separate and distinct acts of delay" for purposes of imposing multiple 5814 penalties. In the instant case, there was no such stipulation or other legally significant event which served to separate real party in interest's delinquency into independent and distinct acts.